UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------- x
                          :
LISA T.[1],                           :           3:20 CV 1764 (SRU)
*Plaintiff,*              :
                          :
V.                              :
                          :
KILOLO KIJAKAZI,[2] ACTING     :
COMMISSIONER OF SOCIAL      :
SECURITY,              :
*Defendant*.            :
                          :           DATE: JANUARY 19, 2022
                          :
-------------------------------------------------- x

RECOMMENDED RULING ON THE PLAINTIFF'S MOTION TO REVERSE
THE DECISION OF THE COMMISSIONER AND
ON THE DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks

review of a final decision by the Commissioner of Social Security ("SSA" or "the Commissioner"),

denying the plaintiff Supplemental Security Income benefits ("SSI").

I.      ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for SSI on May 10, 2018, claiming that she had been

disabled since then,[3] due to "headaches, diabetes, peripheral neuropathy, high blood pressure,

ankle problem, anxiety disorder, acid reflux, and asthma." (Doc. No. 13, Certified Transcript of

Administrative Proceedings, dated March 29, 2021 ["Tr."] 15, 104). The plaintiff's application

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted, therefore, for Andrew Saul as the defendant in this suit. *See* 42 U.S.C. § 405(g).

[3] Initially, the plaintiff reported her onset date of disability as December 24, 2011 (*see* Tr. 86), but at her hearing before the ALJ, the plaintiff moved to amend the alleged onset date to the application date. (Tr. 52).

was denied initially and upon reconsideration, and on August 29, 2019, a hearing was held before Administrative Law Judge ("ALJ") John Aletta, at which the plaintiff and Zachary T. Fosberg, a vocational expert, testified. (Tr. 15). The plaintiff was represented by counsel at this hearing. (*Id.*). On October 3, 2019, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 32-82). On October 21, 2019, the plaintiff requested review from the Appeals Council, and on September 29, 2020, the Appeals Council denied the request, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

On November 24, 2020, the plaintiff filed her complaint in this pending action. (Doc. 1). Absent consent to a Magistrate Judge, this case was referred to the undersigned for all purposes, including issuing a recommended ruling. (Doc. No. 9). On July 7, 2021, the plaintiff filed her Motion to Reverse the Decision of the Commissioner (Doc. No. 20), with a Statement of Material Facts (Doc. No. 20-2), and a brief in support (Doc. No. 20-1 ["Pl.'s Mem."]). On September 3, 2021, the defendant filed his Motion to Affirm (Doc. No. 22), with a Statement of Material Facts (Doc. No. 22-2), and a brief in support (Doc. No. 22-1 ["Def.'s Mem."]). The plaintiff filed a Response to the defendant's Motion to Affirm on September 27, 2021. (Doc. No. 25).

For the reasons stated below, the Court respectfully recommends that the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 20), be **DENIED**, and the defendant's Motion to Affirm (Doc. No. 22) be **GRANTED**.

II.    FACTUAL BACKGROUND

The Court presumes the parties' familiarity with the plaintiff's medical history, which is discussed in the Statements of Facts. (Doc. Nos. 20-2, 22-2). Though the Court has reviewed the entirety of the medical record, it cites only the portions of the record that are necessary to explain this decision.

A.    <u>THE PLAINTIFF'S TESTIMONY</u>

The plaintiff testified before the ALJ on August 29, 2019. (Tr. 35). On the date of the hearing, the plaintiff was fifty-two years old and living with her twenty-year-old son (Tr. 38), who is self-sufficient. (Tr. 51). She completed eleventh grade and did not obtain a GED. (Tr. 38-39). From 2014 to 2015, the plaintiff was self-employed as a hairdresser and earned approximately $9,000 a year. (Tr. 39-40). The plaintiff testified that, in the last eight years, she occasionally did household chores such as cooking or cleaning, but a partner who no longer lived with her did most of the chores. (Tr. 49). The plaintiff's former partner also helped her with personal hygiene, bathroom, and shower activities, but she was able to do such activities on her own as well. (*Id.*).

Regarding her physical health, the plaintiff stated that she was unable to work because she was asthmatic and needed to take her asthma pump three times a day because she was always "short and out of breath." (Tr. 40). When asked, the plaintiff stated that dust and extreme temperatures aggravated her asthma. (Tr. 46). She used a CPAP machine because she was diagnosed with obstructive sleep apnea. (Tr. 63). She testified that she had difficulty walking up stairs and long distances, which she attributed to her legs and knees, as well as being "out of breath." (Tr. 48). She also took insulin for her diabetes because her "sugar goes up and down out of control," making her feel "nauseous and dizzy a lot." (Tr. 40-41). The plaintiff further stated that she could not carry anything because she used her right hand to support herself with a cane and her left arm was "very heavy." (Tr. 46-47). She also expressed difficulty dressing herself on occasion because of her left arm. (Tr. 47-48). She said that her lower back was "not correct" and required her to walk with a cane and that she had arthritis in her knees. (Tr. 41). She further explained that she had neuropathy in her feet, for which she took medication, and she was incontinent. (*Id.*). When asked, she said that she took medication for "everything"; she took

metformin, Humalog, lancets, medication for "nerves and stuff in [her] back and for [her] feet," a rescue inhaler, and high blood pressure pills. (Tr. 42-43). She also stated that she used to take medication for her chronic migraine headaches, which she would get "every other month." (Tr. 64). All her medication was administered by a home aide and "lock[ed] up in a safe" because she had difficulty remembering to take her medicine every day, given that she took "a lot of different medications." (Tr. 57-58).

The plaintiff was also given a cane and a "potty" by a nurse who came to see her once a week. (Tr. 43). She used the cane regularly. (Tr. 59). As for the "potty," the plaintiff stated that she was given one for her room because of her inability to get to the bathroom on time, due to the urgency of her urination or defecation. (Tr. 59). The plaintiff further testified that she soiled herself frequently and had to change her clothes three times a day because the odor was "nauseating." (Tr. 49-50, 59-60). She also testified that she used a motorized shopping cart when doing her groceries and that she owned an armed tub chair to help her get around her house. (Tr. 58-59).

Regarding her mental health, the plaintiff explained that she was on antipsychotic medication because she "sometimes hear[d] voices." (Tr. 42-43). She said that the medication made her feel "really slow" and "a little weird" (Tr. 43), and that she had been going to classes and counseling for her psychological problems for approximately a year. (Tr. 44-45). She stated that her primary care physician, Dr. Niko Broodie-Murray, wanted to run tests on her due to her issues with her memory. (Tr. 48). The plaintiff further stated that, while she did not think she had problems getting along with others, she did recognize that she had a "very bad temper" and that she would "feel very violent to the point that [she would be] ready to hurt [someone]" if someone upset her. (*Id.*). She stated that she had never been admitted to a hospital overnight for psychological problems and that she had not been incarcerated in the last ten years. (Tr. 45-46).

She had no surgeries within the past ten years, other than having her bladder lifted from having children. (Tr. 43).

      B.     <u>VOCATIONAL EXPERT'S TESTIMONY</u>

The ALJ stated, and the vocational expert agreed, that the plaintiff did not have any past relevant work experience. (Tr. 66). The vocational expert was asked about a hypothetical person with the same age, education, and experience as the plaintiff, who could stand and walk up to four hours during each eight-hour work day; use a cane; occasionally reach overhead and push and pull with her non-dominant left upper extremity; occasionally climb ramps and stairs, but could not climb ladders, ropes or scaffolds; could balance and stoop, but only occasionally kneel, crouch, and crawl; could not work at unprotected heights or be exposed to extreme heat or cold, as well as pulmonary irritants; could work in an environment with moderate noise level; required three random, unscheduled bathroom breaks, each lasting five minutes; could perform simple, routine tasks and recall and execute simple, routine instructions; could tolerate occasional interaction with coworkers; maintain basic personal hygiene and grooming; and could tolerate occasional minor changes in work setting and procedures, as well as set simple, routine work plans. (Tr. 66-67). The vocational expert stated that such a hypothetical person could perform three unskilled positions at the light exertional level: assembler, sorter, and cashier. (Tr. 68-69). The vocational expert testified that if a hypothetical person were only able to stand for two hours in an eight-hour workday, the three positions he had already mentioned would still be appropriate. (Tr. 71). He further testified that a hypothetical person that was off-task fifteen percent of each eight-hour workday would be unable to perform work at any level. (Tr. 73). Additionally, a hypothetical person who was off-task approximately ten percent or more of the time at work would not be tolerated, and unscheduled breaks were considered off-task. (Tr. 75). Therefore, a person who was away from the workstation

for five minutes each hour would not be tolerated, nor would someone who took two unscheduled breaks for fifteen minutes at a time. (Tr. 76). The vocational expert also stated that the number of available jobs were significantly reduced for someone who always needed to be approximately ten to fifteen feet from the bathroom. (Tr. 77).

When asked by the plaintiff's attorney, the vocational expert stated that the positions of assembler, sorter, and cashier could be performed from a seated position, but that only assembler jobs existed at the sedentary exertional level. (Tr. 73-75).

## III.   THE ALJ'S DECISION

Following the five-step evaluation process,[4] the ALJ found that the plaintiff had not engaged in substantial gainful activity since May 10, 2018, the application date. (Tr. 17, citing 20 C.F.R. §§ 416.971 *et seq*.).

At step two, the ALJ found that the plaintiff had the following severe impairments: obesity; asthma; depressive disorder; generalized anxiety disorder; diabetes; osteoarthritis of the knees; left shoulder osteoarthritis with bone spur; degenerative disc disease of the lumbar spine; and chronic migraines. (Tr. 12, citing 20 C.F.R. § 416.920(c)).

---

[4] First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 416.920(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 416.920(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 416.920(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work. *See* 20 C.F.R. § 416.1520(a)(4)(iv). If the claimant shows she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 416.920(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

The ALJ concluded at step three that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart p, Appendix 1. (Tr. 18). Specifically, the plaintiff's physical impairments did not meet or medically equal the criteria of listing 1.02 (major dysfunction of a joint), 1.02B (involvement of one major peripheral joint in each upper extremity), 1.08 (soft tissue injury (*e.g.*, burns) of an upper or lower extremity, trunk, or face and head, under continuing surgical management), 1.04 (disorders of the spine), 3.03 (asthma), and 11.02 (epilepsy); as for her mental impairments, they did not meet listings 12.04 (depressive, bipolar, and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders). (Tr. 18-19, citing 20 C.F.R. §§ 416.920(d), 416.925, and 416.926).

The ALJ concluded that the plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(b) with the following limitations: she could only stand for two hours during each eight-hour workday; she must use a cane for walking; she could occasionally reach overhead and push or pull objects with her left arm; she could occasionally climb ramps and stairs, but could not climb ladders, ropes, or scaffolds; she could occasionally kneel, crouch, and crawl; she could not work at unprotected heights; she must avoid concentrated exposure to extreme heat and cold, as well as concentrated exposure to dust, odors, fumes, gases, and other pulmonary irritants; she required three random unscheduled bathroom breaks during each eight-hour workday, each lasting five minutes; and she could tolerate occasional interaction with coworkers. (Tr. 20).

At step four, the ALJ concluded that the plaintiff had no past relevant work experience. (Tr. 24, citing 20 C.F.R. § 416.965). At step five, however, the ALJ found that the plaintiff could perform the jobs of assembler, sorter, and cashier—all of which existed "in significant numbers"

in the national economy. (Tr. 25, citing 20 C.F.R. §§ 416.969 and 416.969(a)). Accordingly, the ALJ concluded that the plaintiff was not under a disability at any time since May 10, 2018, the date the application was filed. (Tr. 26, citing 20 C.F.R. § 416.920(g)).

## IV.    STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). "The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact." *Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Further, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v.*

*Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.    <u>DISCUSSION</u>

The plaintiff argues that the ALJ erred in three respects. First, the ALJ erred at step two and/or step four in evaluating the plaintiff's incontinence, and in failing to develop the record further on this issue. (Pl.'s Mem. at 10-14). Second, the ALJ's assessment of the opinion of Dr. Broodie-Murray did not comply with statutory regulations. (Pl.'s Mem. at 15-18, citing 20 C.F.R. §§ 404.1527 and 416.927). Third, the ALJ cherry-picked evidence to arrive at a particular result. (Pl.'s Mem. at 18-22).

The defendant denies these allegations and states that the ALJ's decision was substantially supported. (Def.'s Mem. at 3-4). The defendant claims that the administrative record was properly developed (Def.'s Mem. at 5-6), the appropriate level of consideration was given to the alleged severity of the plaintiff's medical impairments (Def.'s Mem. at 6-8), and the ALJ drew proper and reasonable evaluations of the RFC based on the record, including the plaintiff's subjective allegations. (Def.'s Mem. at 9-17). However, in a reply to the defendant's Motion to Affirm (Doc. No. 25 ["Pl.'s Rep."]), the plaintiff counters that the defendant is offering only impermissible *post hoc* rationalizations; and furthermore, the rationale offered is unpersuasive and does not in any way contradict the claims of error. (Pl.'s Rep. at 3).

A.    <u>THE ALJ'S CONCLUSIONS AT STEP TWO AND STEP FOUR, AND HIS DEVELOPMENT OF THE RECORD</u>

1.    <u>THE ALJ DID NOT COMMIT REVERSIBLE ERROR IN HIS STEP TWO ANALYSIS</u>

The plaintiff argues that the ALJ erred because he did not consider whether the plaintiff's incontinence, either fecal or urinary, is medically determinable, or severe, at step two. (Pl.'s Mem. at 11). The defendant argues that the more-than-2,000-paged record did not have any "obvious

gaps," and therefore was sufficient for the ALJ to render a decision. (Def.'s Mem. at 5). Moreover, the defendant states that the plaintiff did not meet her burden of proof to show that a more restrictive RFC applied. (*Id.* at 7).

At step two, the ALJ must determine the severity of a claimant's asserted impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii); *see also id.* at (c). An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities, *see Social Security Ruling* ("SSR") 96–3p, 1996 WL 374181, at *1 (S.S.A. July 2, 1996); likewise, an impairment is "non-severe" if it is only a slight abnormality that has a minimal effect on a claimant's ability to perform basic work activities. *Id.* The claimant bears the burden of proof at step two in establishing severity, such that the mere presence of diagnosis of a disease, impairment, or treatment thereof is not, by itself, sufficient to render a condition severe. *Bailey v. Berryhill*, No. 3:18-CV-00013 (WIG), 2019 WL 427320, at *3 (D. Conn. Feb. 4, 2019) (citing *Taylor v. Astrue*, 32 F. Supp. 3d 253, 265 (N.D.N.Y. 2012)).

From as early as October 2012 to September 2019, the plaintiff was repeatedly seen for incontinence, among other conditions. (*See* Tr. 1630 (10/16/12 (urinary)), 1575 (10/15/15 (urinary)), 345 (07/03/18 (urinary)), 1753 (08/15/19 (urinary)), 1575 (08/15/19 (fecal)), 1767 (09/25/19 (urinary and stress)), 1769 (09/25/19 (fecal))). She underwent a urine test on October 7, 2015 and was told that, if her incontinence did not improve, she would be referred to a urogynecologist. (Tr. 1575). The plaintiff was again referred to urology on July 3, 2018. (Tr. 347). An MRI of her spinal cord was also ordered on June 21, 2019, after the plaintiff indicated that she had lost control of her bowel movements. (Tr. 2040).

While there are no records of the plaintiff being seen by a urologist, the MRI results from July 18, 2019 indicated that: in the L3-4 disc, the plaintiff had mild to moderate degeneration

bilaterally; in the L4-5 disc, the plaintiff had disc desiccation and small to medium sized central disc protrusions that were new since 2008, interval collapse of the disc space with ventral extradural osteophyte formation, moderate central canal stenosis that had progressed since 2008, stenosis of the right (moderate to severe) and left (mild) neural foramens that had progressed, and progressive degeneration of the right (severe) and left (moderate) facet joints; and in the L5-S1 disc, the plaintiff had disc desiccation, small central disc protrusion that had progressed, mild stenosis of the spinal canal, progressive mild stenosis of the right and left neural foramens, and minimally progressing degeneration of the right (severe) and left (moderate) facet joints. (Tr. 2080). Additionally, the plaintiff submitted records from her home health aides, wherein the notes from November 6, 2018 indicated that she had been given a bedside commode to help with her incontinence. (Tr. 1370). She also testified to the same at the August 29, 2019 hearing before the ALJ, stating that the commode had been given to her because of her inability to get to the bathroom on time, due to the urgency of her urination or defecation. (Tr. 43, 59). The plaintiff also testified that she frequently soiled herself and had to change her clothes about three times a day because the odor was "nauseating." (Tr. 49-50, 59-60). Medical professionals also noted that the plaintiff smelled of urine. (*See* Tr. 1376 (10/22/18), 1403 (11/08/18), 1359 (11/30/18)).

The ALJ did not consider the plaintiff's incontinence to be severe. At step two, however, the ALJ *did* find other severe impairments: obesity; asthma; depressive disorder; generalized anxiety disorder; diabetes; osteoarthritis of the knees; left shoulder osteoarthritis with bone spur; degenerative disc disease of the lumbar spine; and chronic migraines. (Tr. 17). The ALJ then proceeded with the subsequent steps of the sequential analysis. (*See* Tr. 18-24; 20 C.F.R. § 404.1545(e)). In fact, the plaintiff concedes that the ALJ considered her incontinence because the ALJ included an allowance for three unscheduled, five-minute bathroom breaks in his RFC. (*See*

Pl.'s Mem. at 12; Tr. 20). Since the ALJ considered the plaintiff's incontinence along with her other impairments at the subsequent steps of the analysis, the ALJ's failure to identify the plaintiff's incontinence as severe at step two constitutes, at best, harmless error. *See Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (finding harmless error where ALJ identified other "severe impairments" and considered non-severe impairments at subsequent steps); *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (finding harmless error where ALJ's consideration of doctor's report would not have affected ALJ's adverse determination); *Lumpkin v. Saul*, No. 3:19-CV-01159 (WIG), 2020 WL 897305, at *3 (D. Conn. Feb. 25, 2020) (finding that "the question whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence," so long as all impairments are considered in remaining steps) (internal quotations and citations omitted). Therefore, the ALJ did not commit a reversible error at step two of the analysis.

2.    THE ALJ DID NOT ERR AT STEP FOUR, AND THE RECORD DOES NOT REQUIRE FURTHER DEVELOPMENT

After reviewing the plaintiff's testimony and her July 18, 2019 MRI, the ALJ allowed the plaintiff a limitation of three random, unscheduled five-minute bathroom breaks during each eight-hour workday. The plaintiff argues that the ALJ erred in his incontinence analysis at step four because (1) the ALJ's bathroom-break limitation was not supported by substantial evidence and (2) the ALJ should have sought clarification or otherwise developed the record with the opinion of a medical expert. (Pl.'s Mem. at 12-14). The defendant counters that the ALJ considered the record as a whole and the plaintiff's subjective complaints and found that her impairments did not impose a greater limitation than those included in the RFC, such as the bathroom-break limitation. (Def.'s Mem. at 10).

At step four, the ALJ is required to determine the claimant's RFC to perform work available to her. 20 C.F.R. § 404.1520, 404.1560. A claimant's RFC is defined as "the most [she] can do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). In determining a claimant's RFC, the ALJ must consider the claimant's reports of pain and other limitations, 20 C.F.R. § 416.929; *see Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing *McLaughlin v. Sec'y of Health, Educ. & Welfare*, 612 F.2d 701, 704–05 (2d Cir.1980)), but also may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record. *Genier*, 606 F.3d at 49 (citing *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir.1979)). Like at step two, it is the claimant's burden to demonstrate her functional limitations that preclude her from performing any substantial gainful activity. 20 C.F.R. § 416.912(a). A lack of supporting evidence here, particularly when coupled with other inconsistent record evidence, can constitute substantial evidence supporting a denial of benefits. *Barry v. Colvin*, 606 F. App'x 621, 622 (2d Cir. 2015) (citing *Talavera v. Astrue*, 697 F.3d 145, 153 (2d Cir. 2012)); *Reynolds v. Colvin*, 570 F. App'x 45, 47 (2d Cir. 2014) (same). When reviewing the record, the ALJ is only required to develop the record fully and fairly; this does not require him to discuss every piece of evidence in the record, whether it is cited in his decision or not. *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted).

Here, the ALJ acknowledged the plaintiff's testimony regarding her incontinence (Tr. 20), and pointed to the July 18, 2019 MRI results in his brief discussion of the plaintiff's incontinence. Specifically, the ALJ stated:

> The claimant reported some lower back pain and some incontinence issues. However, she exhibited normal range of motion, no edema, or tenderness or numbness. A lumbar spine magnetic resonance image (MRI) was taken in July 2019 and it showed mild to moderate degenerative bilaterally at the L3-4, severe facet joint degeneration on the right at the L4-5 and L5-S1 levels, but moderate on the left. There was only mild stenosis, and paraspinal tissues were normal.

(Tr. 22; *see also* Tr. 2080). The MRI was ordered by Dr. Broodie-Murray, the plaintiff's treating physician, on June 21, 2019, in light of the plaintiff's fecal incontinence. (Tr. 2040). The plaintiff's issue with this analysis is two-fold: the first is that the ALJ's discussion of the July 2019 MRI only pertains to the plaintiff's back, and not to her gastrointestinal system. (Pl.'s Mem. at 12). It should be noted, however, that the MRI report *only* contains diagnoses of the plaintiff's back, and *not* any information referring to her gastrointestinal system. (Tr. 2080). Therefore, the ALJ was appropriately relying on the information he was provided, as it is the plaintiff's burden to establish her functional limitations.

The plaintiff also argues that the ALJ did not rely on any supporting rationale or citation to the record when making his limitation, specifically pointing out that "no medical provider has opined that the plaintiff['s] condition can be accommodated by three unscheduled bathroom breaks." (Pl.'s Mem. at 13). Indeed, the ALJ does not make any citation to a medical opinion on limitations for the plaintiff's incontinence because there are none. Neither the plaintiff's treating physician, Dr. Broodie-Murray, nor either of the state agency medical consultants found the plaintiff's incontinence to require any limitations. (*See* Tr. 2798-99 (Dr. Broodie-Murray); 117, 120-22 (state agency medical consultants)). The only limitation offered was by occupational therapist Jessica Arias, to whom the plaintiff was referred to by Dr. Broodie-Murray; Jessica Arias recommended a bedside commode to help her with the plaintiff's nighttime incontinence. (*See* Tr. 1370). There is no other evidence of the plaintiff being seen by a urologist, nor was the plaintiff recommended for surgery or prescribed any medications. This is despite the plaintiff repeatedly seeking medical opinions on her incontinence. (*See* Tr. 1630 (10/16/12 (urinary incontinence diagnosis)), 1575 (10/15/15 (urinary incontinence diagnosis and referral to urology)), 345 (07/03/18 (urinary incontinence diagnosis and referral to urology)), 2040 (06/21/19 (referred for

MRI of spinal cord after plaintiff indicated loss of control of bowel movements)), 1753 (08/15/19 (urinary incontinence diagnosis)), 1575 (08/15/19 (fecal incontinence diagnosis)), 1767 (09/25/19 (urinary and stress incontinence diagnosis)), 1769 (09/25/19 (fecal incontinence diagnosis))).

As such, the plaintiff's citation to *Dailey v. Astrue*, No. 09-cv-0099, 2010 WL 4703599, at *11 (W.D.N.Y. Oct. 26, 2010), is distinguishable. (*See* Pl.'s Mem. at 14). While in *Dailey*, the ALJ improperly ignored a medical advisor's assessment where the record otherwise barely contained evidence—much less substantial evidence, as the standard requires—to support the ALJ's RFC determination, here, the ALJ has already considered the plaintiff's testimony and the MRI results, in addition to the opinions of the plaintiff's treating physician and the state agency medical consultants that do not mention anything about the plaintiff's incontinence. (*See* Tr. 20, 22). Moreover, the ALJ is required to develop the record fully and fairly, which means that the ALJ must rely on *all* evidence, and not merely on medical opinions. *Trepanier v. Comm'r of Soc. Sec. Admin.*, 752 F. App'x 75, 79 (2d Cir. 2018).

While the plaintiff argues that the ALJ's RFC does take into consideration the severity of her limitations, the plaintiff has not met her initial burden to establish a more restrictive RFC, such that she has not pointed to medical evidence indicating that she requires more than the three unscheduled bathroom breaks allocated by the ALJ. (Pl.'s Mem. at 13). *See Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) ("Here, Smith had a duty to prove a more restrictive RFC, and failed to do so.").

Therefore, the ALJ's analysis at step four is supported by substantial evidence. The plaintiff's arguments that the record needs further development and, relatedly, that the Commissioner engaged in impermissible *post hoc* rationalization are thus without merit.

B.    THE ALJ CORRECTLY ASSESSED DR. BROODIE-MURRAY'S OPINION UNDER THE NEW REGULATIONS

The plaintiff acknowledges that the change in regulations has "altered or abrogated" the treating physician rule, but argues that here, the ALJ used the new regulations to "rely solely on agency consultants while dismissing treating physicians in a conclusory manner." (Pl.'s Mem. at 15). The plaintiff concedes that the ALJ "actually agrees with a significant number of the limitations assigned by [the plaintiff's treating physician]" but maintains that the ALJ impermissibly characterized the limitations that he did not agree with as "extreme." (Pl.'s Mem. at 17, n.10). The plaintiff claims that the ALJ's lack of citation to the record and failure to identify what treatment notes and examinations were contrary to the treating physician's opinion was merely "generalized rationale or boiler plate statement[s] devoid of specificity." (Pl.'s Mem. at 17). Further, the plaintiff cites *Dany Z. v. Saul*, No. 2:19-CV-217, 2021 WL 1232641, at *11 (D. Vt. Mar. 31, 2021), for the proposition that the conclusory rejection of a treating physician's opinion in favor of the state agencies examiners' opinions constitutes error. (Pl.'s Mem. at 15-17). The defendant argues that the ALJ's decision comported with the new regulations regarding the treating physician's rule. (Def.'s Mem. at 11).

In his ruling, the ALJ found Dr. Broodie-Murray's opinion to be inconsistent with notes from the treating facility. (Tr. 24). On August 22, 2019, Dr. Broodie-Murray completed a form titled "Medical Source Statement Of Ability To Do Work-Related Activities (Physical)." (Tr. 2795-99). In that form, Dr. Broodie-Murray indicated that the plaintiff could occasionally lift up to twenty pounds and carry up to ten pounds; could sit for up to two hours and stand and/or walk up to an hour; required a cane for walking; could frequently reach, handle, finger, and feel bilaterally but only occasionally push and/or pull; could occasionally climb ramps and/or stairs, but never any other postural activity; could not differentiate sizes and/or shapes, understand simple

16

instructions, work at a reasonable pace, or walk on uneven or rough surfaces; and would be absent four or more days a month and be off-task for ten to twenty percent of the day. (*Id.*) Dr. Broodie-Murray did not fill out the questions that required the identification of relevant documents, tests, or diagnoses for the limitations. (*Id.*). Despite this lack of information, the ALJ still found that Dr. Broodie-Murray was correct to assign the plaintiff only the limitations of occasionally lifting up to twenty pounds and carrying up to ten pounds, using a cane for walking, occasionally climbing ramps and stairs, and pushing and/or pulling with the left upper extremity. (Tr. 24). The ALJ did not find the following limitations persuasive: that the plaintiff could not sit for more than two hours, nor stand/walk for more than an hour; could not engage in any other postural activity other than occasional ramp climbing and stairs; could not differentiate sizes and/or shapes, understand simple instructions, work at a reasonable pace, or walk on uneven or rough surfaces; and would be absent four or more days a month and be off-task for ten to twenty percent of the day. (*Id.*).

The Social Security Administration changed its regulations regarding consideration of medical opinion evidence by eliminating the "treating physician's rule" for claims filed on or after March, 27, 2017. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 FED. REG. 5844, 5848-49 (Jan. 18, 2017); *see also* 20 C.F.R. §§ 404.1520c, 416.920c. Prior to the shift in regulations, an ALJ was to defer to the opinions of a claimant's treating physician because said physician was "most able to provide a detail, longitudinal picture" of a claimant's medical history and limitations and "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone. . ." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The ALJ was to give a treating physician's opinion "controlling weight" if the opinion was supported by other substantial evidence in a claimant's record; if the ALJ did not give

a treating physician's opinion controlling weight, he was to apply factors[5] to determine how much weight to assign to that opinion. *Id.* ("When we do not give the treating source's medical opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the medical opinion."). The ALJ was to also give "good reason" in his notice of determination or decision for the weight given to a treating physician's medical opinion. *Id.*

Moreover, while medical opinions of a claimant's treating physicians were given deference, consulting sources like state agency examiners were given limited weight. *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) ("[Limiting the weight of consulting sources] is justified because 'consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day. Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons.'") (citations omitted). If the opinion of a treating physician and consulting source were conflicting, however, the ALJ was to generally favor the treating physician unless the treating physician's opinion was overridden by substantial evidence supporting the consulting source and not the treating physician. *See e.g., Camille v. Colvin*, 104 F. Supp. 3d 329, 343 (W.D.N.Y. 2015) (upholding ALJ's decision to afford treating physician's opinion "little weight" because said opinion was not supported by substantial evidence); *Jones v. Shalala*, 900 F. Supp. 663, 669 (S.D.N.Y. 1995) ("Opinions of consultative physicians may override those of treating sources only if supported by substantial evidence in the record.") (citing *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995)).

---

[5] They were the length of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship; supportability; consistency; specialization; and other factors which tend to support or contradict the medical opinion. *Id.* at §§404.1527(c)(2)-(6), 416.927(c)(2)-(6).

The new regulations do not require the ALJ to assign specific weight or deference to any medical opinion, including a treating physician's opinions. *See* 20 C.F.R. § 416.920c(b)(1) ("We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually."); *Dayle B. v. Saul*, No. 3:20-cv-00359 (TOF), 2021 U.S. Dist. LEXIS 80855, at *87, n.4 (D. Conn. Apr. 28, 2021) (citing *Jacqueline L. v. Comm'r of Soc. Sec.*, 515 F. Supp. 3d 2, 7-8 (W.D.N.Y. 2021)). Instead, the ALJ is to apply a codified list of factors in articulating how each medical opinion influenced the ALJ's final decision—these factors are: supportability, consistency, relationship to the claimant, specialization, and other factors that tend to support or contradict the medical opinion. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). A medical opinion that fulfills the two main factors of supportability and consistency is considered a persuasive opinion. *Id.* at §§ 404.1520c(c)(2), 416.920c(c)(2). An opinion has "supportability" if the explanations and the objective medical evidence cited by the medical source are relevant to support the medical opinion. *Id.* And when compared with the other evidence in the record, the more consistent the medical opinion is with the record, the more persuasive that opinion is. *Id.* at §§ 404.1520c(c)(3), 416.927c(c)(3). The claimant's relationship with their treating physician is split into five sub-factors: (1) the length of the treatment relationship, (2) the frequency of examinations, (3) the purpose of the treatment relationship, (4) the extent of the treatment relationship, and (5) whether there was an examining relationship. *Id.* Regarding specialization, a medical opinion is more persuasive if the medical professional giving the opinion is a specialist in the area relevant to the claimant's alleged conditions. *Id.* at §§ 404.1520c(c)(4), 416.927c(c)(4). The fifth and final factor is a catch-all provision that allows the ALJ to consider factors that tent to support or contradict a medical opinion. *Id.* at §§ 404.1520c(c)(5), 416.927c(c)(5) (including, but not limited to, "evidence showing a medical

source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."). After applying this list of factors, the ALJ is required to explain how he considered a medical source where the opinions offered by two or more medical sources on the same issue are both "equally well-supported . . . and consistent with the record . . . but are not exactly the same." 20 C.F.R. § 416.920c(b)(3).

Here, Dr. Broodie-Murray's opinion is not as "equally well-supported" as the state agencies' consultants' opinion because Dr. Broodie-Murray's limitations are not consistent with the record. As a threshold matter, Dr. Broodie-Murray did not fill out all the questions on his checkbox form, such as the ones asking for supporting documentation for his limitations. (Tr. 2795-99). Additionally, Dr. Broodie-Murray stated that the plaintiff could not sit for more than two hours (Tr. 24), but the plaintiff testified at the hearing before the ALJ that she attended a large family function of over 50 people in New York City on July 6, 2019, where "all [she] did was really sit there and watch." (Tr. 55-56). Dr. Broodie-Murray also reported that the plaintiff could not stand nor walk for more than an hour, nor engage in any other postural activity other than occasional ramp climbing and stairs. (Tr. 24). Outpatient notes from January 17, 2019, however, indicated that the plaintiff was "not homebound" (Tr. 1354), and, at the hearing before the ALJ, the plaintiff testified that she did her own grocery shopping (Tr. 50), and attended parties whenever invited, suggesting a fair level of postural activity. (Tr. 52). Dr. Broodie-Murray's own notes from July 3, 2018 also stated that the plaintiff had no musculoskeletal issues, and did not otherwise indicate that the plaintiff had any issues with prolonged standing, walking, or other postural activities. (Tr. 344-47). At most, the plaintiff was found to be positive for dizziness and headaches. (Tr. 345).

Moreover, there is no indication in the record that the plaintiff could not "differentiate sizes/shapes" or "understand simple instructions," and again, Dr. Broodie-Murray does not point to any supplementary tests or documentation that say otherwise. (Tr. 24). The ALJ acknowledged that, in October 2018, Dr. Jaimie L. Burns, Psy.D., performed a consultative mental evaluation and opined that the plaintiff could perform simple instructions and maintain a schedule.  (Tr. 360). Dr. Burns found the plaintiff "moderately impaired" for attention and concentration and "mild to moderately impaired" for recent and remote memory skills, as well as "average to low average" for cognitive functioning. (Tr. 360). But by June 21, 2019, during a routine visit with Dr. Broodie-Murray, the plaintiff was found having "no sensory deficit" and "normal mood and affect" and "[h]er behavior [was] normal." (Tr. 2045). She was also described as "alert" and "oriented" on June 24, 2019 during her home healthcare visit with New England Home Care, Inc. (Tr. 1429), and "attentive and engaged with others" by Margaret Moore, LCSW, during her treatment group on July 12, 2019. (Tr. 2075).

Lastly, Dr. Broodie-Murray indicated that the plaintiff could not work at a reasonable pace, nor walk on uneven or rough surfaces, and that she would be absent four or more days a month and be off-task for ten to twenty percent of the day. (Tr. 2795-99). However, Dr. Broodie-Murray does not point to any underlying medical records that would otherwise support these medical conclusions, and merely makes these conclusions without any objective evidence. The Second Circuit has supported discounting a treating doctor's opinion when it relies solely on subjective complaints of the plaintiff; for example, in *Smith v. Comm'r of Soc. Sec. Admin.*, 731 F. App'x 28 (2d Cir. 2018), the ALJ was found to have properly rejected an opinion where the doctor's "treatment records only reflect [the claimant's] subjective complaints, and contain[ed] no objective evidence of physical or psychiatric abnormalities" and the doctor "saw [the claimant] only four

times, which the ALJ considered 'unlikely to provide an adequate basis for a thorough understanding' of [the claimant's] conditions and limitations." *Id.* at 30-31. Similarly, Dr. Broodie-Murray only saw the plaintiff four times (*see* Tr. 345 (07/03/18), 1753 (08/15/19), 1575 (08/15/19), 1767-1769 (09/25/19)), and therefore is unlikely to have had an adequate basis for a thorough understanding of the plaintiff's conditions and limitations, as indicated by the treating physician's opinion on the plaintiff's limitations that are devoid of any objective evidence of physical or psychiatric abnormalities. Therefore, the ALJ was not required to cite with specificity what he relied on in determining the persuasiveness of Dr. Broodie-Murray's opinion because this opinion was, at a baseline, not supported by the evidence in the record.

## VI.    CONCLUSION

For the reasons stated above, the Court respectfully recommends that the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 20) be **DENIED** and the defendant's Motion to Affirm (Doc. No. 22) be **GRANTED**.

This is a recommended ruling. *See* FED. R. CIV. P. 72(b)(1). Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days after filing of such order. *See* D. CONN. L. CIV. R. 72.2(a). Any party receiving notice or an order or recommended ruling from the Clerk by mail shall have five (5) additional days to file any objection. *See* D. CONN. L. CIV. R. 72.2(a). Failure to file a timely objection will preclude appellate review. *See* 28 U.S.C. §636(b)(1); Rules 6(a) & 72 of the Federal Rules of Civil Procedure; D. CONN. L. CIV. R. 72.2; *Impala v. United States Dept. of Justice*, 670 F. App'x 32 (2d Cir. 2016) (summary order) (failure to file timely objection to Magistrate Judge's recommended ruling will preclude further appeal to Second Circuit); *Small v. Sec'y of H.H.S.*, 892 F.2d 15 (2d Cir. 1989) (per curiam).

Dated this 19th day of January, 2022 at New Haven, Connecticut.

 /s/Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge
